**BRICKLAYERS AND ALLIED CRAFT-WORKERS LOCAL 2, Albany, New York, AFL–CIO, by Albert Catalano, as President; Bricklayers and Allied Craftworkers Local 2, Albany, New York Pension and Annuity Funds, by its Trustees Albert B. Catalano, Luke Renna, Timothy O'Donnell, Raymond DeThorne, Donald Cote, Stephen O'Sick, J.D. Gilbert, James G. Bradt, Victor Mion, Jr., Thomas Murray, and Earl Hall; Bricklayers and Allied Craftworkers Local 2, Albany, New York Health Benefit Fund, by its Trustees Albert B. Catalano, Luke Renna, Timothy O'Donnell, Raymond DeThorne, Joseph Satalino, Stephen**

O'Sick, J.D. Gilbert, James G. Bradt, Victor Mion, Jr., Thomas Murray, and Earl Hall; Bricklayers and Allied Craftworkers Local 2, Albany, New York Education & Training Fund, by its Trustees Albert B. Catalano, Luke Renna, Timothy O'Donnell, Peter Coons, Michael Supreant, John Buck, James Bradt, Thomas Murray, J.D. Gilbert, Kevin Augustini, Thomas Marinello, and Vic Mion; and Bricklayers & Trowel Trades International Pension Fund, by its Trustees John Flynn, John T. Joyce, Louis Weir, Gerry O'Malley, James Boland, George Harbison, Dominic Spano, James Songer, Charles Velardo, Eugene George, John Wallner, Walter Kardy, Dan Schiffer, and Joseph Speranza, Jr., Plaintiffs,

v.

C.G. YANTCH, INC.; Christopher Yantch, individually; and Yantch Plaster & Stucco Systems, LLC, Defendants.

No. 00–CV–073.

United States District Court, N.D. New York.

Dec. 3, 2003.

Blitman & King LLP (Charles Blitman, Esq., Jennifer A. Clark, Esq., Nathaniel G. Lambright, Esq., of Counsel), Syracuse, NY, for Plaintiffs.

Law Offices of Joseph Camardo (Joseph Camardo, Esq., Brian J. Smith, Esq., of Counsel), Auburn, NY, for Defendants.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

On March 7, 2003, plaintiffs Bricklayers and Allied Craftworkers Local 2, Albany, New York, AFL–CIO ("Union") and various funds into which employers that are party to certain collective bargaining agreements must pay ("funds")[1] (collectively "plaintiffs"), filed a second amended complaint against defendants C.G. Yantch, Inc. ("C.G.Yantch"), Christopher Yantch, and Yantch Plaster & Stucco Systems, LLC ("Yantch Plaster") (collectively "defendants"), alleging six causes of action: *first*—that C.G. Yantch failed to remit $14,368.13 in fringe benefit contributions and deductions from January 1996 to May 1998 under a collective bargaining agreement, in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1145; *second*—that C.G. Yantch failed to remit $8,325.24 in fringe benefit

---

1. Suit was filed on behalf of the Union by its President, Albert Catalano. (Docket No. 102, ¶ 6.) The four named funds are the Union's pension and annuity fund, the Union's health benefit fund, the Union's education and training fund, and the Bricklayers & Trowel Trades International Pension Fund. Suit is brought on behalf of each fund by its trustees. Albert Catalano, Luke Renna, Timothy O'Donnell, J.D. Gilbert, James Bradt, Victor Mion, and Thomas Murray are trustees for all three Union funds; Raymond DeThorne, Kevin Potter, and Earl Hall are trustees for the pension and annuity fund and the health benefit fund;

Donald Cote is also a trustee for the union's pension and annuity fund; Joseph Satalino is a trustee for the Union's health benefit fund; Peter Coons, Michael Supreant, John Buck, Kevin Augustini, and Thomas Marinello are all trustees of the Union's education and training fund; and the trustees of the Bricklayers & Trowel Trades International Pension Fund are John Flynn, John T. Joyce, Louis Weir, Gerry O'Malley, James Boland, George Harbison, Dominic Spano, Paul Songer, Charles Velardo, Eugene George, John Wallner, Walter Kardy, Dan Schiffer, and Joseph Speranza, Jr. *Id.* at ¶¶ 6–10.

contributions and deductions from January 1, 1999, to April 31, 2000, under another collective bargaining agreement, in violation of 29 U.S.C. § 1145; *third*—that defendants are further delinquent in remitting required fringe benefit contributions and deductions, in an amount to be determined, from January 1996 to May 1998, in violation of 29 U.S.C. § 1145; *fourth*—that Yantch Plaster is liable for the delinquencies claimed in the first three causes of action; *fifth*—that defendants should be enjoined from further breaches of the collective bargaining agreements (and documents incident thereto) and ERISA; and *sixth*—that Christopher Yantch is personally liable for the delinquencies claimed in the first three causes of action.

Pursuant to Federal Rules of Civil Procedure 12 and 56, both plaintiffs and defendants have filed motions to dismiss and/or for partial summary judgment. Plaintiffs have also moved to strike and/or dismiss certain counterclaims asserted by defendants in their second amended answer.

Oral argument was heard May 9, 2003, in Utica, New York. Decision was reserved.

## II. BACKGROUND

### A. *Factual Background*

1. *The Parties*

The Union is a labor organization whose members work in the bricklaying/masonry/plastering business. The funds were established to ensure that Union members working for employers party to certain collective bargaining agreements would receive fringe benefit contributions. The funds are administered by trustees, *see supra* note 1, and act as collection agent for the International Union, the Defense Benefit Fund, the Promotional Fund, the Industry Advancement Program/Industry Advancement Fund, the Political Action Committee, and the International Masonry Institute, all of which employers must also pay into pursuant to the collective bargaining agreements.

C.G. Yantch is a now-dissolved corporation that started doing business in 1986 or 1987. The company was a contractor largely engaged in the plastering and stucco business, with approximately 75% of its work attributable to exterior insulation finish systems, which comprised both plastering and carpentry work, 10% attributable to conventional plastering and lathing, including thin coat plastering, and 15% attributable to building construction/addition or metal framing. Christopher Yantch was the company's sole shareholder and director. He was also the company president and vice president, while his wife was the secretary and treasurer. Corporate meetings were held once a year, but mainly consisted of an accountant going over the financial aspects of the business with him.

Aside from Christopher Yantch, C.G. Yantch employed Michele Vivenzio as a full-time bookkeeper, Christopher Yantch's brother David as a field supervisor, and a part-time estimator. Though his brother was given the authority to sign contracts and checks, the final authority on which jobs the company bid, and on all other decisions of consequence, rested with Christopher Yantch. The company also employed several work crews, but these individuals were laid off during the winter months, during which the company performed little to no work.

C.G. Yantch had three business addresses throughout its tenure, the last of which was on property owned by Christopher Yantch where a warehouse existed. He would lease space in the warehouse to the company, which would pay him monthly rent.

Yantch Plaster was formed October 31, 2000, while C.G. Yantch was still in business and several months after the initial complaint in this lawsuit was filed. Christopher Yantch is its sole shareholder and director, though his wife receives a weekly paycheck from the new company as well. Yantch Plaster's business involves many of the same types of activities as C.G. Yantch, but Christopher Yantch claims the new company is more diversified. Yantch Plaster successfully bid for a contract some time around its formation, but had to subcontract the work to C.G. Yantch because the new company did not yet have workers' compensation insurance or a payroll for employees. C.G. Yantch performed the work on the contract, and Yantch Plaster paid it for the labor. Yantch Plaster paid C.G. Yantch roughly $23,000 in November of 2000.

Some time in the fall or winter of 2000, Christopher Yantch unilaterally decided to dissolve C.G. Yantch. He claims such dissolution was necessary because of the poor workers' compensation rates the company had to pay, and because he was going through a divorce and wanted his then-wife Nina disassociated with his business.

Yantch Plaster began leasing the same office space that C.G. Yantch had leased from Christopher Yantch, and all of C.G. Yantch's full-time employees were transferred over to Yantch Plaster's payroll on January 1, 2001, the same day a payroll was established and workers' compensation insurance was obtained for the new company. Because the work on some contracts successfully bid on by C.G. Yantch had yet to be performed, and C.G. Yantch at that point no longer had workers' compensation insurance, some labor was subcontracted to Yantch Plaster, for which it was paid by C.G. Yantch. This apparently occurred on several occasions, and Christo-pher Yantch characterized the contracts as being Yantch Plaster's.

Through an auction, Yantch Plaster acquired $25,300 worth of C.G. Yantch's equipment, including vehicles and trailers. Christopher Yantch claims, however, that he used his own personal finances to capitalize Yantch Plaster, and no proceeds from C.G. Yantch projects were transferred to the new company. At the advice of an insurance agent, Yantch Plaster was added as an additional insured to a C.G. Yantch insurance policy, and the new company set up a bank account at one of the institutions used by C.G. Yantch. The same thing was done with respect to leases on certain vehicles. Yantch Plaster also loaned money to C.G. Yantch on a few occasions to help the latter pay bills and make payments on the leased vehicles.

Yantch Plaster purchased a new computer system, and did not use the one C.G. Yantch utilized while it was in business. Christopher Yantch sent out notices to certain customers, informing them that his company had changed names, though he claims this was done in order to prevent C.G. Yantch's name from coming up on the customers' computer screens when his name was typed in. He had developed personal relationships with many of these customers, who, in addition to some new customers, became customers of Yantch Plaster.

Yantch Plaster never signed a collective bargaining agreement. Christopher Yantch claims none of its employees are Union members.

### 2. The Collective Bargaining Agreements

The substantive dispute between plaintiffs and defendants centers around two collective bargaining agreements. The first was entered into by the Union and the Construction Employers of Central

New York, Inc., the Labor Relations Section of Mohawk Valley Builders Exchange, Inc., and the Labor Relations Section of Northern Builders Exchange, Inc. (the "CEA Agreement") and generally encompassed all masonry/plastery work performed by Union members in and around Utica, Syracuse, Oswego, Watertown, and Ogdensburg, from June 27, 1995, to May 31, 1998. (Docket No. 55, Ex. 3.) The second was entered into by the Union and the Eastern Contractors Association, Inc. (the "ECA Agreement") and covered "all work performed by bricklayers, masons, plasterers, and marble setters" in the counties of Albany, Columbia, Fulton, Greene, Hamilton, Montgomery, Rensselaer, Schenectady, and Warren, from May 1, 1997, to April 30, 2000. (Docket No. 55, Ex. 4.) Both required employers party to the agreements to pay into the funds fringe benefit contributions and deductions for each hour of bargaining unit work performed by covered employees, and were subject to the trust agreements under which the funds were administered. If an employer was delinquent in making such payments, the agreement mandated the payment of interest, collection costs, and legal and audit fees. Employers were also required to make available their books and records for inspection and audit, and submit to the fund trustees periodic reports showing the names of individuals who performed collective bargaining work and the hours such individuals worked.

C.G. Yantch signed the CEA Agreement on June 27, 1995. (Docket No. 89, Ex. E.) However, by letter dated February 13, 1998, the Union notified the company that it wished to change the terms of the agreement, which was set to expire a few months later in May of 1998. (Docket No. 89, Ex. G, ¶ 8.) There is no evidence C.G. Yantch ever agreed to the modified terms. It has been agreed that this letter, therefore, terminated the CEA Agreement as of May 31, 1998.

It does not appear as though C.G. Yantch signed the actual ECA Agreement. However, on February 26, 1998, a "Letter of Intent" was sent to the company from the Union. The one-page document states that C.G. Yantch, as a signatory, agrees with the [U]nion "that it will abide by, sign and become a party to the collective bargaining agreement being negotiated with, and to be entered into, between the Union and [ECA], to pay all wages and fringe benefits under said agreement to be dated May 1, 1997, and to abide by all other terms of that agreement." (Docket No. 59, Ex. G, Att. A.) According to the document, "[a]ll payments of wages and fringe benefits will be retroactive to May 1, 1997." *Id.* Defendants admit that Christopher Yantch signed the letter of intent, but claim that he did so without reading it, based on the repeated assurances of a Union steward that signing would only obligate the company to pay the benefits of one local plasterer for only the work he performed on a C.G. Yantch plaster project at a prison in Coxsackie, New York.

By letter dated January 25, 2000, a few months prior to the expiration of the ECA Agreement, the Union sought to negotiate with C.G. Yantch the terms of the agreement. (Docket No. 90, pp. 5–6; Docket No. 93, Ex. D.) By letter dated June 1, 2000, from the Union to the company, the Union listed several changes to the ECA Agreement. (Docket No. 86, Ex. O.) There is no evidence that C.G. Yantch ever agreed to the proposed changes to the agreement. It has been agreed that these letters, individually or together, terminated the ECA Agreement as of April 30, 2000.

### B. Claims, Defenses, and Counterclaims

Plaintiffs' claims and defendants' defenses have evolved over the protracted, con-

tentious procedural history of this case. When a decision needs to be rendered as to the proper amount of damages, this entire history will be outlined. For the purposes of this opinion, however, such is unnecessary, as the most recent complaint and answers, coupled with only references to prior submissions, suffice to resolve the pending motions.

On March 7, 2003, over ten months after concluding that their damages under the CEA Agreement were lower than that alleged in the original and amended complaints, and nearly eight months after concluding the same with respect to the ECA Agreement, plaintiffs filed their second amended complaint. (Docket No. 102.) Plaintiffs in the *first* cause of action allege that C.G. Yantch failed to remit fringe benefit contributions and deductions under the CEA Agreement from January 1996 to

May 1998 in the amount of $14,368.13, exclusive of interest, liquidated damages, and legal and auditing fees. *Id.* at ¶ 28. This amount is less than half of what was claimed in the original and amended complaints, and reflected plaintiffs' early 2002 discovery of the February 13, 1998, letter that terminated the CEA Agreement as of May 31, 1998.[2] Plaintiffs do claim, however, in the *third* cause of action that additional amounts may be owed under said agreement. (Docket No. 102, ¶ 42.)

In the *second* cause of action, plaintiffs claim C.G. Yantch failed to remit $8,325.24 in fringe benefit contributions under the ECA Agreement from January 1, 1999, to April 31, 2000. *Id.* at ¶ 33. This is a mere 6% of what was alleged to be the delinquency under the ECA Agreement in the amended complaint.[3] Thus, the alleged unpaid contributions in the second amend-

---

2. In the original and amended complaints, plaintiffs alleged that C.G. Yantch failed to remit $34,020.39 in fringe benefit contributions and deductions under the CEA Agreement from January 1996 through December of 1998. (Docket No. 1, ¶¶ 16–17; Docket No. 36, ¶¶ 27–28.) In February 2002, the month after the filing of the amended complaint, Albert Catalano, the union president, forwarded to plaintiffs' counsel the February 13, 1998, letter. (Docket No. 89, Ex. G, ¶¶ 7–8.) Plaintiffs did not make defendants immediately aware of this letter, though it should be stated that the letter was addressed and sent to C.G. Yantch in 1998. Rather, at the time plaintiffs claim that the import of the letter was unknown, and it was not until an April 23, 2002, board of trustees meeting of the funds that they concluded the letter would prevent the recovery of any unpaid contributions under the CEA Agreement after May 31, 1998. *Id.* at ¶ 12. Even then, it does not appear that plaintiffs explicitly made defendants aware of the letter. Instead, on June 7, 2002, roughly a month and a half after the meeting, plaintiffs' counsel obliquely informed defendants' counsel of her belief regarding the impact of the letter—that it terminated the CEA Agreement as of May 31, 1998—but she did not expressly refer to the letter itself. *Id.*, Ex. J.

3. In the original complaint, plaintiffs referred to only one collective bargaining agreement, presumably the CEA Agreement. However, after realizing they had a valid claim under the ECA Agreement, they amended the complaint, claiming that C.G. Yantch failed to remit $135,375.62 in fringe benefit contributions and deductions from January 1, 1999, to December 31, 2000. (Docket No. 36, ¶ 33.) They also claimed that the company owed contributions and deductions for the period of time from January 1, 2001, onward in an amount believed to exceed $10,000. *Id.* at ¶¶ 47–48. On July 10, 2002, plaintiffs discovered the January 25, 2000, letter while conducting document review at defendants' counsel's office. (Docket No. 90, pp. 5–6; Docket No. 93, Ex. D.) In August of 2002, plaintiffs became aware of the June 1, 2000, letter when defendants confronted the union president with the same at his deposition. (Docket No. 86, Ex. O.) Thus, by the end of August 2002, plaintiffs were aware that the ECA Agreement had terminated as of April 31, 2000, and, consequently, that the alleged delinquencies were severely overstated. (Docket No. 101, p. 11.)

ed complaint total $22,693.37, exclusive of interest, liquidated damages, and other fees, which is less than 15% of the total amount alleged in the amended complaint. In the *fifth* cause of action, plaintiffs seek to enjoin further violation of the collective bargaining agreements (and documents incident thereto) and ERISA.

In the *fourth* and *sixth* causes of action, plaintiffs seek to hold Yantch Plaster and Christopher Yantch liable for the delinquencies proven in the *first, second,* and *third* causes of action. *Id.* at ¶¶ 44–51, 63–68. Specifically, plaintiffs claim Yantch Plaster is the alter ego and successor of C.G. Yantch, or that it and C.G. Yantch are a single employer. With respect to Christopher Yantch, plaintiffs claim he is the alter ego of the two companies, or they are the alter ego of him, and that he can be held personally liable for any delinquencies.

On March 17, 2003, the defendants filed identical answers to the second amended complaint. (Docket Nos. 103–05.) All three asserted ten "affirmative defense[s]," four "affirmative defenses ... and counterclaims," and one "counterclaim." *Id.* at ¶¶ 70–112. In no less than three places in the answers, defendants claim that, if the ECA Agreement was entered into by C.G. Yantch and the Union, it was done so because of plaintiffs' fraud. In the *fourth* affirmative defense, defendants claim that the agreement was "fraudulently executed by the plaintiffs." *Id.* at ¶ 77. In the *eleventh* affirmative defense/*first* counterclaim, defendants claim that "[p]laintiffs fraudulently caused [C.G. Yantch] to execute a certain 'Letter of Intent' that they allege forms the basis for the defendants' liability under the [ECA Agreement] by a) misrepresenting the true content of the document, and b) by withholding a full copy of the agreement and the appropriate signature page." *Id.* at ¶ 91. In the *four-*

*teenth* affirmative defense/*fourth* counterclaim, defendants allege that a union steward requested that C.G. Yantch execute the letter of intent in order for the Union and funds to accept contributions from the company for certain employees working on a particular job. *Id.* at ¶ 100. Further, defendants allege the steward informed C.G. Yantch that the letter of intent would only bind it to the ECA Agreement until May 31, 1998. *Id.* at ¶ 101. Allegedly in reliance on these representations, Christopher Yantch signed the document on behalf of C.G. Yantch. *Id.* at ¶ 102.

In the *twelfth* affirmative defense/*second* counterclaim, defendants allege that, even if C.G. Yantch did enter into a collective bargaining agreement, plaintiffs breached it by not providing qualified and appropriate plasterers. *Id.* at ¶¶ 93–94. In the *thirteenth* affirmative defense/*third* counterclaim, defendants allege that C.G. Yantch made overpayments under both the ECA and CEA Agreements, *id.* at ¶ 97, despite an earlier denial of their discovery request for information defendants contended was important to this claim, (Docket No. 83.)

The *fifth* counterclaim uses as its basis some of the language from the denial of a motion for sanctions filed by defendants for plaintiffs' failure to disclose the February 13, 1998, letter in a more timely fashion. According to defendants, Magistrate Judge Randolph Treece " 'concluded that he suspected that counsel for plaintiff 'may have deliberately failed to disclose the February 13, 1998, letter' ... 'to gain some unexplained advantage' ... 'and to stretch the defendants' resources to exhaustion.' " (Docket Nos. 103–05, ¶ 108.) Thus, defendants allege in this counterclaim that the failure to disclose the letter was "deliberate[ ] and fraudulent[ ]," and damaged defendants in that they "ha[ve] been forced to incur tens of thousands of

dollars in unnecessary legal fees defending against an action that [plaintiffs] have long known was without merit." *Id.* at ¶¶ 107, 109.

## III. DISCUSSION

### A. Federal Rules of Civil Procedure 12 and 56 Standards

In deciding a Rule 12(b)(6) motion, a court "must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint 'unless it appears beyond a reasonable doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief.' " *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995). However, conclusory allegations that merely state the general legal conclusions necessary to prevail on the merits and are unsupported by factual averments will not be accepted as true. *See, e.g., Clapp v. Greene,* 743 F.Supp. 273, 276 (S.D.N.Y.1990); *Albert v. Carovano,* 851 F.2d 561, 572 (2d Cir.1988).

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Service,* 180 F.3d 426, 436 (2d Cir.1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson,* 180 F.3d at 436; *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983). Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. At that point the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348.

### B. The Alleged Delinquencies

#### 1. Whether there are delinquencies

Pursuant to Section 515 of ERISA, 29 U.S.C. § 1145, employers must pay into benefit funds fringe benefit contributions and deductions in accordance with collective bargaining agreements to which they are a party. Plaintiffs claim in the *first* cause of action that, under the CEA Agreement, from January 1996 to May 1998, C.G. Yantch failed to pay required fringe benefit contributions and deductions in the amount of $14,368.13.[4] Plain-

---

4. Plaintiffs also claim in the *third* cause of action that additional amounts may be due and owing for this period of time, but they do not seek summary judgment on the same. (Docket No. 117, ¶ 60.) Despite plaintiffs' contention that they "may" seek judgment on

tiffs claim in the *second* cause of action that, under the ECA Agreement, from January 1999 through April 2000, C.G. Yantch failed to pay required fringe benefit contributions and deductions in the amount of $8,325.24. Though they make several arguments to the extent of any delinquency, and the propriety of interest and liquidated damages thereon, and legal and auditing fees in connection therewith, defendants do not appear to dispute the actual fact that there were delinquencies, if indeed C.G. Yantch was party to the collective bargaining agreements. Thus, assuming C.G. Yantch was bound to the collective bargaining agreements, *see infra*, Section 515 was violated.

### 2. *Responsibility for delinquencies*

C.G. Yantch, as signatory to the CEA Agreement and the ECA letter of intent, is liable for the delinquencies, subject to any defenses properly asserted, which will be discussed, *infra*. Plaintiff also claims, however, in the *fourth* and *sixth* causes of action, that Yantch Plaster, as the successor and/or alter ego of C.G. Yantch, or to the extent it and C.G. Yantch are a single employer, and Christopher Yantch personally,[5] are liable for any delinquencies. It is here noted that defendants have offered no substantive opposition to plaintiffs' arguments in this regard. They submitted no memorandum of law in opposition to plaintiffs' motion for summary judgment against Yantch Plaster and Christopher Yantch, and no reply to plaintiffs' statement of material facts with respect to said motion that complies with the Local Rules.[6] Rather, defendants' opposition consists of an affidavit from counsel and a document entitled "Statement of Material Facts," neither of which addresses plaintiffs' motion, or any arguments made in support thereof, in anything close to substantive detail.[7] It is from these rather paltry submissions that defendants' opposition is taken. Only the single employer, alter ego, and personal liability theories will be discussed.[8]

### a. *Single employer*

Plaintiffs claim that Yantch Plaster should be held liable for the delinquen-

---

this claim at trial, the third cause of action will be dismissed with prejudice. The claim is based on defendants' alleged failure to disclose all pertinent records to plaintiffs' auditor. However, no specifics are offered as to this alleged failure, and the second amended complaint provides nothing near a specific figure as to the amount of additional unpaid contributions alleged to be owed, in contrast to the first two causes of action, which are very specific. This failure to be specific, combined with the fact that plaintiffs will be made whole as a result of the first two causes of action, and that the clear focus of the case is on the first two causes of action, warrant dismissal of the *third* cause of action.

5. *See infra note 9.*

6. Defendants did submit a statement of material facts, but it neither specifically corresponds with plaintiffs' nor contains any admission or denial of plaintiffs' assertions. Local Rule 7.1(a)(3).

7. The affidavit consists of 88 numbered paragraphs, only nine of which relate to the issues raised in plaintiffs' motion against Yantch Plaster and Christopher Yantch. (Docket No. 116.) The statement of material facts consists of 23 numbered paragraphs, only three of which relate to the issues in plaintiffs' motion. (Docket No. 115.) Given both sides' propensity to flood the court with submissions on nearly every issue that has arisen in this law suit in the past few years—however cost-inflating the decision, and however minuscule or meritless the issue—defendants' failure to adequately respond to plaintiffs' motion is all the more surprising.

8. Because it is here found that Yantch Plaster and C.G. Yantch are a "single employer," and/or that the former is an alter ego of the latter, there is no need to also determine whether Yantch Plaster may be held liable for the unpaid contributions under the successor theory.

cies because it and C.G. Yantch are a "single employer." Where two companies are nominally distinct but actually act as a "single integrated enterprise," they are considered a single employer and each is bound to the obligations of any collective bargaining agreement signed by the other. *Lihli Fashions Corp. v. NLRB,* 80 F.3d 743, 747 (2d Cir.1996). "The single employer standard is relevant when 'separate corporations are not what they appear to be, that in truth they are but divisions or departments of a single enterprise.'" *Clinton's Ditch Coop. Co. v. NLRB,* 778 F.2d 132, 137 (2d Cir.1985) (quoting *NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 402, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960)). There are four pertinent factors to consider when determining if two companies are a single employer: (1) the extent to which the companies' operations are interrelated; (2) whether the companies share common management; (3) whether the companies centralize control of labor relations; and (4) whether the companies share common ownership. *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Serv. of Mobile, Inc.,* 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965). The Second Circuit, in *Lihli Fashions,* added to this list the factors of whether the companies utilize common office facilities and equipment, and whether there exists a family relationship between the enterprises. 80 F.3d at 747. The single employer doctrine, however, is only to be invoked when the two companies "*concurrently* perform the same function and one entity recognizes the union and the other does not." *Newspaper Guild of N.Y. Local No. 3 v. NLRB,* 261 F.3d 291, 303 (2d

Cir.2001) (quotations and citation omitted) (emphasis in original).

■ Here, C.G. Yantch and Yantch Plaster operated concurrently for two months. The operations of the companies' were interrelated, as one company frequently provided labor for the projects of the other, and most or all of the employees providing such labor have at all times been associated with C.G. Yantch or Yantch Plaster. The two companies also share common ownership and management. Christopher Yantch was the sole corporate officer and shareholder of C.G. Yantch, and he is and has always acted in an equivalent capacity for Yantch Plaster. For both companies, he was and is the final authority on all field- and office-related issues. As noted, substantially the same employees were used for both companies, including office staff, an estimator, and field workers. The two companies also leased the same office space from the same person, Christopher Yantch. All this, combined with the lack of response by defendants, is enough to conclude as a matter of law that C.G. Yantch and Yantch Plaster were a single employer.

### b. Alter ego

■ Plaintiffs also claim that Yantch Plaster can be held liable for the delinquencies because it is an alter ego of C.G. Yantch.[9] Where two companies are not concurrently performing the same functions, and one of the companies is instead "*replac[ing]*" the other, invocation of the alter ego doctrine, and not the single employer doctrine, is more appropriate. *Newspaper Guild,* 261 F.3d at 303 (quota-

---

9. Plaintiffs also claim that the two companies are alter egos of Christopher Yantch. However, they also claim he should be held personally liable under *Leddy v. Standard Drywall, Inc.,* 875 F.2d 383, 388 (2d Cir.1989), and its progeny, in which the Second Circuit outlined the framework for an individual's personal liability that gave even less deference to the corporate form than does the alter ego theory of liability. Because there are questions of fact under this more lenient standard, the alter ego theory need not be discussed.

tions and citation omitted) (emphasis in original). To prevail under the alter ego doctrine, plaintiffs must demonstrate "the existence of a disguised continuance or an attempt to avoid the obligations of a [collective bargaining agreement] through a sham transaction or technical change in operations." *Lihli Fashions*, 80 F.3d at 748; *Local One, Amalgamated Lithographers v. Stearns & Beale, Inc.*, 812 F.2d 763, 772 (2d Cir.1987). Relevant are whether the two companies in question have "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Lihli Fashions*, 80 F.3d at 748. If it is demonstrated that two companies are, in fact, alter egos of each other, "then each is bound by the collective bargaining agreements signed by the other," including any obligation therein to make fringe benefit contributions. *Id.*

As noted, Yantch Plaster and C.G. Yantch had identical management, supervision, and ownership. Though defendants claim that Yantch Plaster's work is more diversified than that of C.G. Yantch, there is no question that they engage in substantially the same type of work, as evidenced by the many customers the companies had in common. Yantch Plaster purchased $23,500 worth of C.G. Yantch's equipment. That this equipment was purchased through an auction does not change the fact that it was essentially Christopher Yantch, on behalf of Yantch Plaster, purchasing equipment from himself, on behalf of C.G. Yantch. Yantch Plaster actually took over contracts originally awarded to C.G. Yantch, despite not even participating in the bidding process. Also as noted, the two companies leased identical office space from Christopher Yantch, and used many of the same business institutions, including insurance agents and banks. In fact, Yantch Plaster was actually added as an additional insured on at least one of C.G. Yantch's insurance policies, and its name was substituted on the lease of certain vehicles. Plaintiffs, in the face of almost no opposition, have adduced enough evidence to demonstrate that, as a matter of law, C.G. Yantch and Yantch Plaster were the alter ego of one another.[10]

### c. personal liability

Plaintiffs claim in the *sixth* cause of action that Christopher Yantch is personally liable for the delinquencies. For plaintiffs to prevail, they must demonstrate that he is "a controlling corporate officer [who] defraud[ed] or conspir[ed] to

---

**10.** This conclusion is not reached without sympathy for defendants. Mr. Yantch's intentions in forming Yantch Plaster, while still in question, could be construed as rather innocent. It could be argued that he truly did just want lower insurance costs and to be disassociated with his ex-wife. It could be argued that forming a new business made sense to fulfill those purposes, and that it is perfectly natural to re-hire trusted employees and maintain a solid customer base, especially given the fact that the new business would be doing work very similar to that of the old company. However, it could also be argued that the new company was formed to evade the old company's ERISA obligations. Its operating agreement, after all, was signed after this lawsuit was filed, and C.G. Yantch has virtually no assets left to satisfy any judgment against it. Its equipment was conveniently purchased at an auction by the new company, and its contracts were overtaken as well. While this scenario creates a triable issue of fact as to whether Christopher Yantch himself may be liable for the delinquencies, Yantch Plaster is not so fortunate, and federal courts, in attempting to ensure that ERISA's purposes are served, have had no problems elevating the interests of funds above those of their contributors. Thus, even if Yantch Plaster was formed under innocent pretenses, the method of its creation, and its close interaction and relationship with a company that disregarded its ERISA obligations, suffices to hold it responsible.

defraud [the] fund[s] of required contributions[.]" *Leddy*, 875 F.2d at 388; *see also Sasso v. Cervoni*, 985 F.2d 49, 50 (2d Cir. 1993) (mandating that more than an individual's status in the corporation is necessary to hold him or her liable for a company's failure to fulfill an obligation). Whether an individual is a controlling corporate officer is dependent on his or her "actual role in the company's affairs and relationship to the company's wrongdoing." *Cement and Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Serv. Fund, and Annuity Fund v. Lollo*, 35 F.3d 29, 33 (2d Cir.1994). Here, it is clear that Christopher Yantch is a controlling corporate officer. He was the sole shareholder of C.G. Yantch. He made all of the company's substantive decisions, including those dealing with unions, and was responsible for the company's payment of fringe benefit contributions for union workers.

However, there are at least factual questions over whether he intentionally defrauded or conspired to intentionally defraud the funds of contributions. An individual "defrauds" when he or she knowingly makes a false representation of an existing fact, with an intent to defraud, that causes damages. *Id.* Plaintiffs claim the false representation made by Christopher Yantch was his failure to inform them of the fact that his employees were performing bargaining unit work. They claim that he exhibited an intent to defraud the funds when, after realizing that plaintiffs were aware of the misrepresentation, he formed Yantch Plaster and transferred to or hid within it all of C.G. Yantch's substantive assets.

Defendants, on the other hand, claim that Christopher Yantch was unaware C.G. Yantch was party to the collective bargaining agreements, and formed Yantch Plaster to decrease workers' compensation costs. They claim his failure to correctly report was not done knowingly. In the face of such equally plausible reasons for the actions taken by Christopher Yantch, a triable issue of fact has been raised and summary judgment is inappropriate. Thus, plaintiffs' motion for summary judgment as to Yantch Plaster must be granted, but it must be denied to the extent it seeks to hold Christopher Yantch personally liable for the delinquencies.

### 3. *Defendants' answers*

In their answers, defendants assert ten "affirmative defense[s]," four "affirmative defense[s] and ... counterclaim[s]," and one "counterclaim," to plaintiffs' claims that they are liable for unpaid fringe benefit contributions plus interest, liquidated damages, and other fees. (Docket Nos. 103–05, ¶¶ 70–110.) Thus, alleged are fourteen affirmative defenses and five counterclaims. Both groups will be discussed in turn.

#### a. *affirmative defenses*

Plaintiffs' substantive claim is that C.G. Yantch has failed to fulfill its duty under Section 515 of ERISA, 29 U.S.C. § 1145, to make contributions to the funds pursuant to the collective bargaining agreements to which it was bound. "In recognition of the fact that millions of workers depend upon employee benefit trust funds for their retirement security," *Southwest Adm'rs, Inc. v. Rozay's Transfer*, 791 F.2d 769, 773 (9th Cir.1986), and "because plans must pay out to beneficiaries whether or not employers live up to their obligations," *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 314 (2d Cir.1990), federal courts interpreting Section 515 "have unanimously regarded it as a limitation on the defenses available to an employer when sued by an employee benefit plan," *id.*

The Second Circuit has identified only two defenses to a collection action under Section 515: "(1) that the pension contributions themselves are illegal, and (2) that the collective bargaining agreement is void (not merely voidable)." *Id.* (citations omitted). So long as an employer "knowingly signs an agreement that requires [it] to contribute to an employee benefit plan, [it] may not escape [its] obligation by raising defenses that call into question the union's ability to enforce the contract as a whole." *Id.* Therefore, in the absence of questions of fact going to the validity of the agreement itself, which would imply the agreement was void as a whole and would not signify the employer was "knowingly" signing an agreement to contribute, *DeVito v. Hempstead China Shop, Inc.*, 38 F.3d 651, 653 (2d Cir.1994), excluded from the permissible defenses to a Section 515 collection action are those going to contract formation—such as a lack of a meeting of the minds, unilateral or mutual mistake, or duress, all of which if proven render an agreement voidable, but not void [11]—as well as defenses sounding in breach of contract, *see O'Hare v. Gen. Marine Transp. Corp.*, 740 F.2d 160, 170 (2d Cir.1984) (union's breach of collective bargaining agreement does not relieve employer of obligation to contribute) (citing *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 468–71, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960)).

Nearly all of the affirmative defenses either fall within this specific prohibition or are not otherwise enumerated as permissible defenses by *Benson*, and must be

dismissed. The only affirmative defenses requiring further discussion are the *fourth, eleventh,* and *fourteenth,* which sound in fraud. (Docket Nos. 103–05, ¶¶ 76–77, 90–92, 99–105.)

There are two possible types of fraud in this situation, one permitted, the other not. Excluded from the realm of possible defenses to a Section 515 collection action is fraud in the inducement, *Benson,* 907 F.2d at 314 (citing *Trustees of Laborers Local Union # 800 Health and Welfare Trust Fund v. Pump House, Inc.,* 821 F.2d 566, 568 (11th Cir. 1987)),[12] which occurs when a party is induced "to assent to something he otherwise would not have," *Rozay's Transfer,* 791 F.2d at 774 (citation omitted). Permitted, however, is the defense of fraud in the execution, which "occurs where there is a 'misrepresentation as to the character or essential terms of a proposed contract,' and a party signs without knowing or having a 'reasonable opportunity to know of its character or essential terms.'" *Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 31–32 (2d Cir.1997) (quoting Restatement (Second) of Contracts § 163 comment a (1981)). Thus, there is a distinction drawn "between actions which invalidate the underlying [collective bargaining agreement] and conduct, including [even] unilateral action by the employer, which raises potential defenses to the enforceability of a facially valid [collective bargaining agreement]." *La. Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry*

---

11. *Bakery and Confectionary Union and Indus. Intern. Pension Fund v. Ralph's Grocery Co.,* 118 F.3d 1018, 1021 (4th Cir.1997) (meeting of the minds); *Bituminous Coal Operators' Ass'n v. Connors,* 867 F.2d 625, 632–36 (D.C.Cir.1989) (unilateral/mutual mistake); *DiRose v. PK Mgmt. Corp.,* 691 F.2d 628, 634 (2d Cir.1982).

12. *See also Agathos v. Starlite Motel,* 977 F.2d 1500, 1506 (3d Cir.1992); *Berry v. Garza,* 919 F.2d 87, 90 (8th Cir.1990); *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.,* 870 F.2d 1148, 1153 (7th Cir.1989).

*Contracting Co.,* 157 F.3d 404, 408 (5th Cir.1998) (citation and footnote omitted).

Defendants claim, in the *fourth, eleventh,* and *fourteenth* affirmative defenses, to be arguing fraud in the execution, not fraud in the inducement. As noted, in the *fourth* affirmative defense, they conclusorily claim that "[i]f an agreement was entered into between the parties, it was fraudulently executed." (Docket Nos. 103–05, ¶ 77.) In the *eleventh* affirmative defense, defendants are a little more specific, claiming that plaintiffs' "misrepresentation of the true content of the document, and ... withholding [of] a full copy of the agreement and appropriate signature page" caused C.G. Yantch to execute the letter of intent. *Id.* at ¶ 91. Incidentally, there is absolutely no evidence offered to support the claim that any documents were withheld. Rather, defendants' allegations of fraud emanate primarily from the alleged misrepresentations, as evidenced by the *fourteenth* affirmative defense, which is by far the most specific. In the *fourteenth* affirmative defense, defendants claim a Union steward told Christopher Yantch that the letter of intent pertained only to a specific job—not all jobs in the geographic area of the Union—and that signing it would only bind C.G. Yantch to the ECA Agreement until May 31, 1998. *Id.* at ¶ 101. Defendants claim Christopher Yantch signed the letter of intent on the basis of these alleged misrepresentations. *Id.* at ¶ 102.

■ However, in order to prevail on a claim of fraud in the execution, a party must demonstrate " 'excusable ignorance of the contents of the writing signed.' " *Hetchkop,* 116 F.3d at 32 (quoting *Agathos,* 977 F.2d at 1505). Proving excusable ignorance requires a showing that the party satisfied its basic responsibility of reading what it signed. *Id.* at 34. Here, Christopher Yantch claims not to have read the document at all. There is no evidence he was prevented from doing so, or that he had no time to confer with counsel as to the document's meaning and the consequences of signing it. Therefore, fraud in the execution, even if it was properly pled, is unavailable as a defense in this case.

In addition, the allegations made by defendants in support of their affirmative defenses are more properly classified as amounting to a claim of fraud in the inducement. The lower court in *Hetchkop,* faced with allegations that the plaintiffs had surreptitiously replaced an agreement the employer had read with one it had not, found the case similar to *Mason Tenders Dist. Council Welfare Fund, Pension Fund and Annuity Fund v. Lupo,* 90 Civ. 6204, available at 1992 WL 236179 (S.D.N.Y. Sep. 8, 1992), and a decision cited therein, *S. Cal. Retail Clerks Union and Food Employers Joint Pension Fund v. Bjorklund,* 728 F.2d 1262 (9th Cir.1984), both of which involved allegations by an employer that a union official falsely told the employer that signing a document would obligate it to make contributions on behalf of a limited number of employees, when, in fact, the document mandated contributions for all employees. The Second Circuit, however, disagreed, stating that the facts in *Lupo* and *Bjorklund* "[presented] defenses more properly characterized as a fraud in the inducement (which makes a contract not void but merely voidable)." *Hetchkop,* 116 F.3d at 34; *see also Sheet Metal Workers' Int'l Ass'n, Local 206 v. West Coast Sheet Metal Co.,* 954 F.2d 1506, 1510 (9th Cir.1992) (distinguishing *Bjorklund* because it "concerned fraud n the inducement").

Like the allegations made in *Lupo* and *Bjorklund,* defendants claim that the Union steward misrepresented to Christopher Yantch the consequences or scope of the agreement to which he was binding C.G.

Yantch by signing the letter of intent. The steward is not alleged to have misrepresented the nature of the document—that is, that it obligated the company to pay fringe benefit contributions pursuant to a collective bargaining agreement—and there is no evidence or allegations that Christopher Yantch did not sign the document knowing it obligated C.G. Yantch to pay contributions. That he may have been mistaken or misled as to the scope of such obligation does not change the fact that he knew of the obligation in general. His protection in that regard should have come from actually reading the letter of intent, which was not ambiguous in any regard, and/or forwarding it to his attorney for advice on the legal consequences of signing. Defendants make no allegations that the underlying ECA Agreement itself is void in general, or even that the specific sections under which contributions are mandated are void, or even that contributing under the agreement would be illegal. Defendants allege only fraud in the inducement. Therefore, defendants' affirmative defenses must be dismissed.

### b. counterclaims

This, however, does not end the inquiry because certain of the affirmative defenses are also denominated as "counterclaims," and, as such, would presumably present an independent basis on which to allege claims against plaintiffs. However, for the counterclaims to survive, they must have such independent basis. As an initial matter, defendants answers' do not expressly identify which party or parties against which the counterclaims are alleged. Giving defendants the benefit of the doubt, it will be assumed that the *first, second,* and *fourth* counterclaims—asserting breach of contract and fraud in the inducement—are asserted against the Union alone. It will further be assumed that the *third* counterclaim—seeking reimbursement for alleged contribution overpayments—is asserted against the funds alone. Finally, it will be assumed that the *fifth* counterclaim is asserted against the Union and the funds, if for no other reason than it cannot be asserted against plaintiffs' counsel, the party which defendants appear to claim is responsible for the conduct alleged.

The pleading infirmities do not stop at failing to identify the parties against which the counterclaims are asserted. Defendants also fail to allege any legal authority—whether in the form of a statutory citation or as under common law—under which the counterclaims have their basis or bases. With the goal of minimizing any more lawyering on defendants' behalf, and because defendants' answers, in which the counterclaims are found, are presumably responsive to the second amended complaint, it will be assumed that the bases for the five counterclaims are the same as those alleged to be the bases for plaintiffs' claims. Plaintiffs claim jurisdiction is conferred under ERISA and Section 301 of the Labor–Management Relations Act of 1947 ("LMRA"), as amended, 29 U.S.C. § 185. (Docket No. 102, ¶¶ 1, 4–5.)

#### (i). Propriety of counterclaims under LMRA

 Under the LMRA, the Supreme Court has held that "suits for violations of contracts" are proper, but claims concerning the validity of a contract are not. *See Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace and Agric. Implement Workers of Am., Int'l Union,* 523 U.S. 653, 118 S.Ct. 1626, 140 L.Ed.2d 863 (1998). Thus, it would appear that defendants' *second* counterclaim, for breach of contract, would be viable under the LMRA, but the *first* and *fourth* counterclaims, for fraud in the

inducement, would not. *Id.*[13] As the *third* and *fifth* counterclaims are not "suits for violations of contract," they are also improper under the LMRA.

 However, whether the breach of contract counterclaim can be asserted pursuant to the LMRA depends upon whether the LMRA is actually used as a basis for plaintiffs' claims, notwithstanding the reference to it in the "Jurisdiction and Venue" section of the second amended complaint. The only authoritative statutory citation in the paragraphs that form the allegations for the *first* cause of action—which seeks recovery of allegedly unpaid fringe benefit contributions—is Section 515 of ERISA. (Docket No. 102, ¶ 17.) Because the *second* cause of action alleges the same wrong as the *first*, it can safely be assumed that Section 515 is incorporated there as well. The relief requested for these claims is expressly based on the collective bargaining agreements (and documents incident thereto) and ERISA, 29 U.S.C. § 1132(g). *Id.* at ¶ 24. The *fifth* cause of action seeks to enjoin, *inter alia,*

violations of ERISA; the LMRA is not mentioned. Section 301 of the LMRA is not mentioned after its citation in the "Jurisdiction and Venue" section of the second amended complaint. Thus, it appears plaintiffs' *first, second,* and *fifth* causes of action are pursued solely under ERISA.

Such conclusion is further supported by the parties' various submissions throughout this litigation. It is true that plaintiffs claim on several occasions that their claims are pursued under both ERISA and the LMRA.[14] Defendants similarly characterize the lawsuit in various of their submissions as well.[15] However, such references to the LMRA appear to be only nominal. Initially, it is noted that plaintiffs cited ERISA by itself on more than one occasion as the statute under which the claims arise. More specifically, plaintiffs have repeatedly referred to the lawsuit as an "ERISA collection action,"[16] or an "action under ERISA to collect delinquent fringe benefit contributions."[17] Further, the arguments advanced by plaintiffs and defendants pertain largely to Section 515 of

---

**13.** Prior to *Textron*, this was not the case. *See Iron Workers Dist. Council of W. N.Y., Vicinity Welfare and Pension Funds v. Butler Fence Co.*, 919 F.Supp. 589, 596 (N.D.N.Y.1996) (permitting fraud in inducement counterclaim against union under LMRA); *see also Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers, Gen. Truck Drivers, Office Food & Warehouse Local 952 v. Am. Delivery Serv. Co.*, 50 F.3d 770 (9th Cir.1995) ("Section 301(a) encompasses not only a claim that a CBA has been breached ... but also a claim that a CBA is invalid on the basis of fraud in the inducement").

**14.** *See, e.g.,* Docket No. 68, p. 9 ("The amended complaint placed the defendants on notice that the ERISA/LMRA action concerned the collection of fringe benefit deductions pursuant to two collective bargaining agreements with the Union") (emphasis removed); *id.* at 13 (referring to suit as "an ERISA/LMRA collection action"); *id.* at 15 n. 9 (noting that plaintiffs "are alleging a claim under ERISA

and LMRA for breach of a statutory obligation"); Docket No. 113, p. 5 n. 1 (referring to case as "action[ ] for breach of contract under Section 301 of [the LMRA], and action[ ] under ERISA [Section 515]").

**15.** *See, e.g.,* Docket No. 8 (referring to claims as being under ERISA and LMRA); Docket No. 57, p. 5 ("In this action, plaintiffs allege violations of [ERISA] and [the LMRA]"); *id.* at 12–13 ("[T]herefore said letter can not form the basis for liability for a breach of contract claim or for claims under ERISA and the [LMRA]"); Docket No. 70, p. 10 ("The invalid Letter of intent cannot serve as a basis ... to hold the defendants liable for unpaid contributions and benefits to plaintiff funds under ERISA or the [LMRA]").

**16.** *See, e.g.,* Docket No. 68, p. 23; *id.* at 24; Docket No. 75, p. 8; *id.* at 10.

**17.** *See, e.g.,* Docket No. 121, pp. 4, 6.

ERISA, as do the cases cited in support of such arguments.

Moreover, an even more basic reason exists to conclude that plaintiffs are pursuing the *first, second,* and *fifth* causes of action under ERISA only. Section 515 expressly places on an employer party to a collective bargaining agreement an affirmative duty to make fringe benefit contributions. This specific provision would therefore encompass a more general breach of contract claim for the failure to make such contributions, which plaintiffs are implicitly alleging in the second amended complaint. Section 301 of the LMRA generally confers jurisdiction on federal district courts in "[s]uits for violations of contracts between an employer and a [union]." 29 U.S.C. § 185(a). This language could be used to encompass a claim of failure to make fringe benefit contributions, but it is clearly more general. In short, it is simply more sensible to pursue the claim under the more specific statute. Plaintiffs seem to recognize this, as they block-quote Section 515 in the second amended complaint, and refer to it repeatedly in the various memoranda submitted throughout this litigation, while almost no mention is made of the LMRA, or any of the substantive requirements necessary to prove its violation, or apparently any cases interpreting the same. Thus, while plaintiffs are not technically precluded from arguing that the LMRA was violated, they have failed to specifically allege as much. Therefore, as ERISA is the only statute under which the specific claims in the *first, second,* and *fifth* causes of action are plead, the second counterclaim, for breach of contract, cannot be asserted pursuant to the LMRA.

The *fourth* and *sixth* causes of action—which seek to hold Christopher Yantch and Yantch Plaster liable for the alleged delinquencies on the bases that the latter is the alter ego and/or successor of C.G. Yantch and that the former is the alter ego of both companies—cite no statutory authority. Several cases where plaintiffs have sought recovery of delinquent contributions, and asserted claims based on an alter ego or successor theory, have noted that suit was filed under both Section 515 and the LMRA, but at no point identify the specific statute under which the theories are pursued. *See, e.g., LaBarbera v. C. Volante Corp.,* 164 F.Supp.2d 321 (E.D.N.Y.2001); *Plumbers, Pipefitters and Apprentices Local Union No. 112 Pension, Health and Educational and Apprenticeship Plans ex rel. Fish v. Mauro's Plumbing, Heating, and Fire Suppression, Inc.,* 84 F.Supp.2d 344 (N.D.N.Y.2000). It could be argued that, because satisfaction of the theories involves determining merely which parties are bound to a collective bargaining agreement, such claims are more likely within the province of the LMRA, which expressly deals with contracts. However, such an interpretation is at odds with the Supreme Court's admonition in *Textron* that suits under the LMRA must be premised on allegations that a contract was violated, not that a contract is invalid or valid as to a certain party (i.e., that the parties are not bound to the contract), as the *fourth* and *sixth* causes of action explicitly state.

Further, as noted, although plaintiffs are implicitly alleging that the failure to make contributions was a breach of the agreements, which by itself would generally translate, at least facially, into an LMRA claim,[18] plaintiffs chose to recover those contributions under the more specif-

---

**18.** Indeed, plaintiffs could have chosen to pursue the claims for unpaid contributions under the more general LMRA, *see Brown v.* *Sandimo Materials,* 250 F.3d 120 (2d Cir. 2001), but they chose not to do so.

ic ERISA provision, and the specific claims advanced with respect to Christopher Yantch and Yantch Plaster seek to hold them liable for the delinquencies caused by C.G. Yantch's failure to fulfill an *ERISA* obligation. Indeed, a claim seeking to do such things as pierce the corporate veil is not an independent cause of action, " 'but rather is a means of imposing liability on an underlying cause of action.'" *Peacock v. Thomas,* 516 U.S. 349, 354, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996) (quoting 1 C. Keating & G. O'Gradney, Fletcher Cyclopedia of Law of Private Corporations § 41, p. 603 (perm. ed.1990)). Accordingly, the theories of liability advanced in the *fourth* and *sixth* causes of action have been utilized for a variety of different underlying causes of action. *See, e.g., NLRB v. G & T Terminal Packaging Co.,* 246 F.3d 103 (2d Cir.2001)(discussing theories in context of review of NLRB order); *Parker v. Columbia Pictures Indus.,* 204 F.3d 326 (2d Cir.2000) (discussing theories in context of disability discrimination claim); *Smith v. K & F Indus., Inc.,* 190 F.Supp.2d 643 (S.D.N.Y.2002) (discussing theories in context of Title VII discrimination claim). Likewise, where plaintiffs, like the ones here, plead an ERISA violation, imposing liability through the theories in the *fourth* and *sixth* causes of action can be considered additional "equitable relief" under ERISA. *Trustees of Nat'l Elevator Indus. Pension, Health Benefit and Educational Funds v. Lutyk,* 332 F.3d 188, 191 n. 3 (3d Cir.2003).

Plaintiffs admit that they seek in the *fourth* and *sixth* causes of action to hold Yantch Plaster and Christopher Yantch accountable for ERISA violations—not LMRA violations—several times citing Section 515 as the basis for C.G. Yantch's liability, and another ERISA section as the basis for the relief sought as a result of that liability. Thus, in sum and substance,

plaintiffs are arguing that Christopher Yantch, personally and/or as the alter ego of the two companies, and Yantch Plaster, as the alter ego and successor of C.G. Yantch, or to the extent it and C.G. Yantch are a single employer, are responsible for the consequences of C.G. Yantch's breach of its obligation to make fringe benefit contributions and deductions under Section 515. Therefore, because plaintiffs do not utilize the LMRA (or any common law developed thereunder) as a basis for any causes of action, no counterclaims may be asserted pursuant thereto.

■ Even if the second amended complaint, despite not referring to any substantive LMRA provisions other than Section 301 in the jurisdiction and venue section, could be construed as pleading a claim under the LMRA, defendants' *second* counterclaim for breach of contract would still have to be dismissed. Per Article XI of the CEA Agreement, and Article XXIII of the ECA Agreement, any disputes arising out of the collective bargaining agreements must be submitted to arbitration. (Docket No. 55, Exs. 3, 4.) There is no evidence C.G. Yantch, or any other defendant, brought against the Union a grievance alleging that the company was not provided with qualified and appropriate workers, and no allegations that pursuing such a grievance would have been futile or unlikely to redress the wrong alleged. Thus, even under the LMRA, the *second* counterclaim must be dismissed.

### (ii). Propriety of counterclaims under ERISA

Consequently, the only way defendants' counterclaims can survive dismissal is if they can be asserted under ERISA, the statute under which plaintiffs' claims arise. As noted, *supra,* the *first, second, fourth,*

and *fifth* counterclaims cannot be used to thwart a Section 515 collection action. This conclusion is not difficult to reach, as permitting the counterclaims to proceed under ERISA just because they are labeled "counterclaims" and not "affirmative defenses" would be an end-around clearly not intended by Congress. The *third* counterclaim, however, which seeks reimbursement of any overpayments into the funds, is authorized (albeit in a limited fashion) by ERISA. Specifically, defendants claim they are entitled to a return of over $15,000 in contributions they allege were overpaid into the funds. Initially, doubt is expressed as to whether this counterclaim can be asserted at all, as defendants were not permitted to certain discovery they claimed, at the time, was vital to proving this claim. Nevertheless, on the current record, there is no choice under Second Circuit precedent but to dismiss this counterclaim.

 Under 29 U.S.C. § 1103(c)(2)(A), a plan administrator may return a mistaken contribution within six months of becoming aware of it. Returning an overpayment to an employer under this section is permissive, not mandatory. *Dumac Forestry Services, Inc. v. Int'l Bhd. of Elec. Workers,* 814 F.2d 79, 82 (2d Cir.1987). Defendants have made no allegation that a demand was made to the funds for return of the alleged overpayments, so it is difficult to see how Section 1103 is even implicated. Even assuming defendants are correct that C.G. Yantch overpaid—an issue certainly not conceded by plaintiffs—the mere establishment of that fact is not enough to prevail. *Frank L. Ciminelli Constr. Co. v. Buffalo Laborers Supplemental Unemployment Benefit Fund,* 976 F.2d 834, 835 (2d Cir.1992) (rejecting "rule of equitable restitution that would allow employers to recover overpayments simply upon a showing of the mistake").

 Instead, to prevail, defendants must demonstrate that a fund's refusal to repay the mistaken contributions was arbitrary and capricious, and that a balance of the equities favors restitution. *Id.* Aside from their failed eleventh hour discovery effort, defendants "made no attempt in discovery to probe the reasons for the fund's failure to repay the [alleged] overpayments or to develop an affirmative case demonstrating arbitrariness or capriciousness." *Id.* at 836. Thus, on the present record, taken in the light most favorable to defendants and assuming there was an overpayment and demand for return, there is simply no credible evidence to sustain the claim, or to conclude it was pled properly.

Even if there was an overpayment, which the fund arbitrarily and capriciously refused to return, defendants still cannot establish the requirement that the equities favor restitution. While the primary equitable consideration is the effect restitution would have on the financial integrity of the plan, *Dumac,* 814 F.2d at 83, "sleeping on one's rights is [also] always a consideration," *Ciminelli,* 976 F.2d at 836 (analyzing time lapses between mistaken contributions, employer's discovery thereof, and request for repayment, and between these events and filing of suit). Allegedly, defendants definitively discovered the alleged overpayment shortly before the discovery was to close on October 15, 2002. Even then, the discovery is better characterized as an allegation, especially since defendants have been denied access to allegedly pertinent information because allowing them to do so would have compromised a discovery deadline that had been extended no less than four times. Any argument that the alleged overpayment was not discovered due to plaintiffs' failure to disclose the letters that demonstrated the agreements were terminated prior to the time

alleged in the complaint is rejected. The letters in question were not secret, coded, intra-union communications purposefully kept from prying eyes. They were addressed to and received by defendants. While plaintiff indeed showed some measure of ineptitude in failing to find the letters, and some measure of chutzpah in the manner and timeliness in which they disclosed the same, the fact remains that defendants had at least constructive possession and knowledge of the letters since their delivery.

That both parties dropped the ball, so to speak, with respect to the letters does not in any way render the equities in defendants' favor. At most, it shows that, with respect to the single equitable consideration of when the overpayment was discovered, the equities are arguably split. In such circumstances, "where there are no equities strongly favoring the employer, the risk of mistake should fall upon the employer." *Id.* As the Second Circuit in *Ciminelli* explained, the Congressional "belie[f] that the risk of mistaken contributions should rest largely with the employer" is grounded in "good reason":

> Funds cannot easily determine whether a payment is mistaken, whereas employers have readily available and accurate information concerning factors such as the number of hours each employee worked in each pay period. Absent costly ongoing audits, funds must depend upon the employer's calculations. Moreover, the future incidence of claims for repayment of mistaken contributions

are not easily predictable by individual funds, particularly small ones. Funds will thus find it difficult to set aside accurate reserves to cover future claims, and beneficiaries of the funds may be undercompensated as a result of conservative judgements as to such reserves. *Id.*

Whether C.G. Yantch overpaid contributions under either or both agreements is a question of fact, one defendants even admit, at least implicitly, they cannot answer. However, no allegation has been made that a demand for repayment was made to the funds, and no factually based allegations have been made that any refusal to repay the contributions was arbitrary and capricious. The equities, even when viewed in the light most favorable to defendants, do not favor restitution. The *third* counterclaim must be dismissed.[19] Thus, as none of the counterclaims can be asserted under ERISA, they must be dismissed, rendering moot plaintiffs' motion to strike.

### B. Issues for Trial and Damages

██ There are two issues left in this case. The first is the proper award of relief to plaintiffs for C.G. Yantch's failure to remit fringe benefit contributions and deductions. Where a plaintiff prevails in an ERISA Section 515 collection action, pursuant to Section 1132(g)(2), "the court shall award the plan (A) the unpaid contributions, (B) interest on the unpaid contributions, (C) an amount equal to the greater of (i) interest on the unpaid contributions, or (ii) liquidated damages pro-

---

**19.** Defendants also argue that "[a]ny delinquency that the defendants may be responsible for during the period of June 1995 to May 1998 will be offset by any overpayment by defendants for contributions and deductions unnecessarily paid to the Funds after the contract terminated in May 1998." (Docket No. 135, p. 10.) To the extent that this statement can be construed as an argument that any

overpayment be considered a setoff to any delinquency amount because the unpaid contributions are not yet plan assets and therefore fall outside of ERISA's limits on reimbursement of overpayments, the same has been rejected by the Second Circuit. *See Brown v. Health Care and Retirement Corp. of Am.*, 25 F.3d 90, 93 (2d Cir.1994).

vided for under the plan in an amount not in excess of 20 percent ... of the amount [found to represent the unpaid contributions], (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and (E) such other legal or equitable relief as the court deems appropriate." 29 U.S.C. § 1132(g)(2)(A)—(E). "As is apparent from the statutory text," the five components of an award under Section 1132(g)(2) are mandatory. *See N.Y. State Teamsters Conference Ret. and Pension Fund v. Boening Bros., Inc.*, 92 F.3d 127, 135 (2d Cir.1996).

Plaintiffs claim that the unpaid contributions total $22,693.37. They claim that, at least as of March 14, 2003, the interest and liquidated damages on the unpaid contributions was $28,064.50. (Docket No. 117, p. 19.) Through November 30, 2003, plaintiffs claim they have incurred $88,600.74 in legal and paralegal fees. *Id.* Finally, plaintiffs seek the recovery of $4,104.37 in audit fees and costs. *Id.*

Defendants argue that, "[b]ased upon the documentary evidence and testimony obtained during discovery, it is clear that the maximum amount of any delinquencies ... [is] likely to fall below the $12,000 Rule 68 Offer of Judgment that was extended by the defendants a couple of months before the plaintiffs filed their Amended Complaint." (Docket No. 116, ¶ 36.) Specifically, they claim that plaintiffs' auditor, Joseph McCarthy, was unable to explain how he arrived at the figures of $14,368.13 and $8,325.24 for the two agreements. *Id.* at ¶ 50.[20] Defendants also contend that the interest and liquidated damages are overstated because

they rely on provisions from a collections policy that post-dated the period of time in which defendants were bound to the collective bargaining agreements. *Id.* at ¶ 41. Finally, defendants argue that the claimed attorneys' and audit fees are not reduced "to reflect the fact that most of the costs that have been incurred could have been avoided if a) the plaintiffs and their counsel had conducted a reasonable pre-filing inquiry by looking at their own correspondence files before amending the complaint in January 2002, and b) the plaintiffs had disclosed to the Court and defense counsel the documentary evidence that they discovered which evidenced the fact the true nature of their claims was far less then [sic] the amounts claimed in the Amended Complaint." *Id.* at ¶ 37.

The plaintiffs' total award pursuant to Section 1132(g)(2) will not be decided at this time, especially given the fact that, aside from the amount claimed to represent the total unpaid contributions, the figures given by plaintiff need updating. For the sake of judicial expediency and conservation, the parties are directed to submit concise and relatively brief written materials (including affirmations and a memorandum of law), along with only necessary exhibits, addressing *only* the Section 1132(g)(2) award, and including the amount believed to be the delinquency as of the date of trial. These materials should identify any relevant interest rates or liquidated damages, the date both accrued or began to run, and should include a separate section addressing the reasonableness of plaintiffs' claimed legal and auditing fees. Based upon the submissions, a total award will be made in the

---

**20.** Plaintiffs claim that Mr. McCarthy's audit essentially combined the two agreements into one and therefore covered what at that time plaintiffs though was the entire alleged delinquency period—January 1, 1996, to Decem- ber 31, 2000—and that defendants were asking him at his deposition to parse out the two agreements without the benefit of a copy of the audit. (Docket No. 118, ¶ 7.)

form of trial by the court pursuant to Fed.R.Civ.P. 39.[21] The parties will be notified when these submissions are due, and of the trial date, in a separate order.

When determining the total award under Section 1132(g)(2), most certainly taken into account, to the *furthest extent possible*, will be the conduct of the parties (and their attorneys) throughout this litigation. It is particularly troubling that a rather straightforward collection action worth no more than $23,000 in principal is still on the docket nearly four years after it was first filed; that it has generated the level of legal fees claimed by the parties; that it has resulted in an almost constant stream of motions (most of them without merit or necessity); and that it has perpetuated a saddening breakdown in civility between plaintiffs' and defendants' counsel. Lost in the shuffle of the attorneys' fee-producing chest-thumping and playground antics, of course, are the clients.

The second issue remaining in the case is whether Christopher Yantch can be held personally liable for C.G. Yantch's delinquencies. Deciding this issue, and Yantch Plaster's liability for that matter, under the equitable theories advanced by plaintiff is most appropriate through Section 1132(a)(3), which provides for the award of "other appropriate equitable relief." Therefore, this issue will also be tried to the bench pursuant to Fed.R.Civ.P. 39(a)(2). *See Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251, 1257–59 (2d Cir.1996) (where the relief sought pursuant to Section 1132(a)(3) is equitable in nature, there is no right to a jury trial); *see also Bittinger v. Tecumseh Products Co.*, 123 F.3d 877, 883 (6th Cir.1997) (no

jury trial right where equitable relief is pursued under Section 1132(a)(3)).

To this point, Magistrate Judge Treece has shown admirable restraint and patience in this case, though even he is clearly weary of the attorneys' conduct. Please be advised that the prior tactics of counsel will not be tolerated. Failure to abide by the professional standards of *civil* practice will result in severe sanctions.

## IV. CONCLUSION

C.G. Yantch was party to the CEA and ECA Agreements and failed to make required fringe benefit contributions and deductions, in dereliction of its obligation to do so under ERISA. Because Yantch Plaster and C.G. Yantch were a "single employer," and because the two companies were alter egos of one another, any amount awarded pursuant to Section 1132(g)(2) as a result of the failure to remit such contributions and deductions are recoverable from Yantch Plaster. Whether Christopher Yantch, personally and/or as the alter ego of the two companies, is also liable for such delinquencies can only be determined after a bench trial. None of the affirmative defenses or counterclaims found in defendants' answers to the second amended complaint are sustainable, and all must be dismissed. The total award pursuant to Section 1132(g)(2) will be made following trial.

Accordingly, it is

ORDERED that:

1. Plaintiffs' motion for summary judgment against defendant C.G. Yantch, Inc., is GRANTED on the issue of liability;

---

**21.** In the event the parties object to this method of establishing the proper contours of a relief award under Section 1132(g)(2), they are directed to submit in writing, no more than ten (10) days after this decision, a memorandum detailing not only the legal basis on which they object to making the award on written submissions, but also a proposed method of making the award and the specific reasons therefor.

2. Plaintiffs' motion for summary judgment against defendant Yantch Plaster & Stucco Systems, LLC, is GRANTED on the issue of liability;

3. Plaintiffs' motion for summary judgment against defendant Christopher Yantch personally is DENIED;

4. Plaintiffs' motion to dismiss defendants' counterclaims is GRANTED;

5. Plaintiffs' motion to strike certain of defendants' counterclaims is DENIED as moot; and

6. Defendants' motion to dismiss and/or for partial summary judgment is GRANTED on the *third* cause of action and DENIED in all other respects.

IT IS SO ORDERED.